



PCM: USA02015R00146

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. RDB-16-0431 |
| | * | |
| RIZWAN PERVEZ, | * | (Food Stamp Fraud, 7 U.S.C. § 2024(b); |
| | * | Wire Fraud, 18 U.S.C. § 1343; Aiding |
| Defendant | * | and Abetting, 18 U.S.C. § 2; Forfeiture, |
| | * | 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. |
| | * | § 853, 28 U.S.C. § 2461(c)) |
| | * | |

*******

## INDICTMENT

### COUNT ONE
### (Food Stamp Fraud)

The Grand Jury for the District of Maryland charges that:

#### Introduction

At all times relevant to this Indictment:

1. Defendant **RIZWAN PERVEZ** ("**PERVEZ**") was a resident of Maryland.

2. Family Member A was married to **PERVEZ** and a resident of Maryland.

#### The Food Stamp Program/Supplemental Nutrition Assistance Program

3. Congress passed the Food Stamp Act of 1977, which was later renamed the Supplemental Nutrition Assistance Program ("SNAP"), in an effort to alleviate hunger and malnutrition. The program used federal tax dollars to subsidize low-income households, which permitted those households to obtain a more nutritious diet by increasing the food purchasing power of eligible persons. SNAP was jointly administered by the United States Department of Agriculture ("USDA") and the Food and Nutrition Service ("FNS") together with various state agencies.

4.     Title 7 of the Code of Federal Regulations, Section 278.2(a), prohibited an authorized retail food store from accepting food stamp coupons in exchange for cash. Further, Title 7 of the Code of Federal Regulations, Sections 278.2(a) and (h) provided that food stamp coupons may "only be accepted from eligible households or the households' authorized representative, and only in exchange for eligible food." Title 7 of the Code of Federal Regulations, Section 271.2 provided that food stamp coupons included "an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food Stamp Act of 1977, as amended, for the purchase of eligible food."

5.     In Maryland, SNAP was administered by the Maryland Department of Human Resources ("DHR") and was known as the Food Supplement Program ("FSP"). Maryland implemented FSP, funded by SNAP, through an Electronic Benefits Transfer ("EBT") system. FSP customers were issued plastic EBT Cards which contained an embedded magnetic stripe that stored basic information required for food purchases. Retailers approved by FNS to accept SNAP were assigned an FNS authorization number and, in some cases, were provided with a point of sale ("POS") device to access the electronic funds allocated to customer's EBT Cards. POS devices communicated with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

6.     Under the FSP, benefits were automatically added to a recipient's EBT Card on a monthly basis. When an EBT Card was swiped through a retailer's POS terminal, the swipe caused an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which contained customer account balance information. The EBT contractor verified the retailer was authorized to conduct SNAP EBT transactions. The Maryland EBT system verified the amount of benefits available, authorized

2

the transaction, and deducted the purchase amount from the customer's available balance. The system also calculated cumulative FSP sales for each retailer and authorized electronic payments to the retailer's bank account.

7. Once the EBT was approved, information flowed back to the POS terminal and the store employee received confirmation that the cardholder's account had been successfully debited. FSP EBT transactions were made for the exact amount of the sale and no change was given to the cardholder. SNAP reimbursements were paid to authorized retailers through a series of electronic funds transfers. On a daily basis, the EBT contractor, located in Austin, Texas, reconciled accounts for participating SNAP retailers in Maryland.

8. In order to participate in the SNAP as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores to FNS. As part of that application, the store owner/manager certified that they understood and agreed that "trade[ing] cash for Supplemental Nutrition Assistance Program benefits" was a "violation" of SNAP regulations.

9. In order to receive SNAP reimbursements, authorized retailers were required to establish a single authorized bank account, approved by FNS, into which EBT benefits from legitimate food stamp transactions would be deposited.

### Pervez's Participation in the Food Stamp Program

10. SA 786 LLC, d/b/a M&N Mini Mart ("M&N"), was a convenience store located in Baltimore, Maryland. Family Member A was the owner of M&N, and the resident agent for the business.

11. Larissa 1 LLC, d/b/a Mega Mart 1 ("Mega Mart"), was a convenience store located in Baltimore, Maryland. Family Member A was the owner of Mega Mart, and the

resident agent for the business. On August 15, 2014, **PERVEZ** filed a Trade Name Application for Mega Mart, and identified himself as "manager".

12. **PERVEZ**, by and through and with Family Member A, owned and operated both M&N and Mega Mart.

13. On or about February 28, 2014, Family Member A submitted an FNS Form 252 for M&N to FNS. As part of that application, Family Member A submitted a form certifying that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

14. On or about March 13, 2014, M&N was licensed by FNS to participate in the food stamp program as a SNAP retailer.

15. On or about January 7, 2015, Family Member A submitted an FNS Form 252 for Mega Mart. As part of the application, Family Member A submitted a form certifying that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

16. On or about January 20, 2015, Mega Mart was licensed by FNS to participate in the food stamp program as a SNAP retailer.

17. From in or about April 2014 through July 2016, **PERVEZ** routinely redeemed and caused to be redeemed EBT benefits in exchange for cash in violation of the food stamp program rules and regulations. As a result of these unlawful cash transactions, **PERVEZ**, by and through his family member, received more than $1.6 million in EBT deposits for food sales that never actually occurred or were substantially inflated. **PERVEZ** knew that exchanging cash for EBT benefits was in violation of the laws, rules and regulations regarding the food stamp

program and that he and his family members were consequently not entitled to the EBT deposits made by FNS into the M&N and Mega Mart accounts.

## The Charge

18. On or about October 19, 2015, in the District of Maryland and elsewhere, the defendant,

**RIZWAN PERVEZ,**

did knowingly use, transfer, acquire and possess food stamp coupons, through an EBT Card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program, that is, defendant **RIZWAN PERVEZ** redeemed beneficiaries' electronic benefits for cash, to wit: $60.00 in exchange for $121.89 from an EBT card number ending in 4687.

7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

## COUNT TWO
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 17 of Count One are incorporated here.

### The Scheme to Defraud

2. From on or about April 2014 through in or about July 2016, in the District of Maryland, the defendant,

**RIZWAN PERVEZ,**

knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions from SNAP, a federally funded national malnutrition program jointly administered by USDA and FNS, together with various state agencies ("the scheme to defraud").

### The Object of the Scheme to Defraud

3. It was the object of the scheme to defraud that **PERVEZ** and others would debit funds from EBT Cards and pay the individual who had presented the EBT Card in cash at less than full value. Typically, **PERVEZ** and others paid the individual who had presented the EBT Card half the value of the amount they had debited in cash. By executing the scheme to defraud, **PERVEZ**, by and through his family member, received at least $1.6 million in EBT deposits for food sales that never actually occurred or were substantially inflated.

## Manner and Means of the Scheme to Defraud

4. It was part of the scheme to defraud that **PERVEZ** created and caused to be created Maryland corporations for the purpose of operating convenience stores that participated in the SNAP program in Baltimore, Maryland.

5. It was further part of the scheme to defraud that **PERVEZ** and Family Member A applied to participate in the SNAP program.

6. It was further part of the scheme to defraud that M&N and Mega Mart, through Family Member A, was authorized to participate in the SNAP program.

7. It was further part of the scheme to defraud that Family Member A opened bank accounts for the purpose of receiving SNAP benefits, of which **PERVEZ** later became a signatory.

8. It was further part of the scheme to defraud that **PERVEZ** and others caused EBT point of sale devices in Maryland to electronically transmit interstate requests to authorize transactions and deduct amounts from EBT customers' available balances for unauthorized and unlawful purposes.

9. It was further part of the scheme to defraud that **PERVEZ** and others caused the Maryland EBT System (through the EBT contractor) to electronically transmit an interstate signal that authorized electronic payment to the bank account of one of the convenience stores. Once the transaction was approved, information flowed back to the POS terminal confirming that the cardholder's account had been successfully debited.

10. It was further part of the scheme to defraud that in order to avoid detection, **PERVEZ** and others debited and caused to be debited funds off an EBT card in multiple transactions over a period of hours to disguise the fraudulent nature of the transactions.

11. It was further part of scheme to defraud that **PERVEZ** and others falsely and fraudulently redeemed and caused to be redeemed from the United States government the full amount of the EBT food stamp benefits charged on the EBT cards and caused this money to be deposited into bank accounts for which **PERVEZ** had signature authority.

## The Charge

12. On or about October 19, 2015, in the District of Maryland and elsewhere, the defendant,

**RIZWAN PERVEZ,**

for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, pictures or sounds for the purpose of executing such scheme and artifice, that is, the defendant knowingly used and caused to be used a point of sale device inside Mega Mart to redeem beneficiaries' electronic benefits for unauthorized and unlawful purposes, which caused communications to be sent from a POS device in Maryland to Texas, to wit: $60.00 in exchange for $121.89 from an EBT card number ending in 4687.

18 U.S.C. § 1343
18 U.S.C. § 2

## **FORFEITURE**

The Grand Jury for the District of Maryland further finds that:

1. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343, as set forth in Count Two of this Indictment, the defendant,

### **RIZWAN PERVEZ,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to a sum of money equal to the value of the proceeds of the scheme to defraud as described in Paragraph 2 of Count Two, which amount is at least $1,689,511.

### **Substitute Assets**

2. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

ROD J. ROSENSTEIN /pem
UNITED STATES ATTORNEY

A TRUE BILL:

8/25/2016
Date

**SIGNATURE REDACTED**

Foreperson